

**IT IS ORDERED as set forth below:**

**Date: February 9, 2023**

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| HEAVEN'S LANDING, LLC, | : | Case No. 20-21350-JRS |
| | : | |
| Debtor. | : | |

**ORDER ON CONFIRMATION OF DEBTOR'S**
**FOURTH AMENDED PLAN OF REORGANIZATION**

This case presents the rare situation where a debtor proposes to pay all of its creditors in cash in full on the Effective Date of the Plan – which in this case is March 3, 2023, about 36 days after the Confirmation Hearing – and preserves the equity interests. This type of result is usually every bankruptcy judge's dream. This case also has the even more rare situation where the secured

1

creditor – or any creditor – is objecting to being paid in cash in full on the Effective Date of the Plan.[1]

One of the primary issues in this case is whether the Debtor, who has pledged all of its assets with substantial equity as collateral to support a loan for a non-affiliated entity, can be subrogated to the rights of the secured creditor when it pays the loan in full after default and receipt of a notice of foreclosure to protect the interest in its property it pledged as collateral.

In rendering this decision, the Court has considered all matters of record in this case, including but not limited to the testimony and other evidence presented at two confirmation hearings, JT Funding Inc.'s Objection to the Plan, Debtor's Response to the Objections, argument of counsel at the Confirmation Hearing, and the briefs submitted to the Court following the Confirmation Hearing.  Based on that, the Court makes the following findings of facts and conclusions of law in addition to those announced on the record during the Court's oral ruling on February 6, 2023 (the "Oral Ruling").

## **FINDINGS OF FACT**

The Debtor is principally owned by Michael Ciochetti, but there are some other limited partners as well.  About 23 years ago the Debtor acquired 500 acres of land in the beautiful North Georgia mountains in Rabun County to develop a residential fly-in community known as Heaven's Landing for $4,075,000 and purchased an adjacent 135 acres for $1,075,000 a few years later.  In other words, the Debtor paid about $5,150,000 to acquire this property more than 20 years ago.

A residential fly-in community is a subdivision in which there is a private runway for residents to use to fly their private planes in and out of the community where they have either

---

[1]    In this Court's 37 years of experience as a judge and as a Chapter 11 practitioner, it has never seen a case where the secured lender, or any other creditor, has objected to being paid in full in cash on the Effective Date of the Plan.

primary or vacation homes.  The Heaven's Landing Subdivision is divided into Phases 1, 2 and 3 (collectively, the "Property").  Phase 1 is approximately 347 acres and Phases 2 and 3 are about 288 acres combined.  The Debtor borrowed about $6,000,000 from Community Bank and Trust ("CBT") and raised about $2,000,000 from investors to develop the property, primarily Phase 1, with improvements such as roads, a 5,000-foot concrete runway and taxi way, 38 hangers, a fuel farm and a 13,000 square foot clubhouse.  Only Phase 1 was pledged as collateral to CBT for its $6,000,000 loan though.  Ciochetti personally guaranteed the note to CBT.  Phases 2 and 3 were unencumbered.

When the Great Recession came in 2008 it hit Georgia banks and the real estate market in North Georgia very hard.  The second home market, a big part of the real estate economy in North Georgia, collapsed as the price of land and houses plummeted.  It became very difficult to sell a home or raw land and almost impossible to get financing or refinancing for a development project. Georgia also led the nation in bank failures in part because so many of the small banks in North Georgia were deeply invested in mortgages on mountain land and second homes.

The Debtor's lender, CBT, was one of those banks that failed and was taken over by the FDIC.  South Carolina Bank and Trust ("SCBT") ultimately acquired the assets of CBT, including the loan it had extended to Debtor.  The value of its collateral for the loan had dropped because of the economic situation.  Even though Debtor had performed its obligations under the loan, the loan had matured or was coming up for maturity and SCBT would not renew it, but SCBT told the Debtor it was willing to settle the loan – with a balance of around $5,700,00 at the time – for $2,600,000, less than 50 cents on the dollar.

Ciochetti discussed the loan situation with two of the property owners in Heaven's Landing, John Auer and Terry Stiles.  Auer and Stiles agreed to loan Debtor the money to settle the debt at

the discounted price and to loan other money to Debtor to continue the development.  Auer and

Stiles formed JT Funding, Inc. ("JT Funding") to be the secured lender to settle the debt to SCBT

at a discount.  When this was proposed to SCBT, the Bank advised them that FDIC regulations

would not permit it to settle the debt at a discount if the Debtor still owned Phase 1, or if the Debtor

or Ciochetti had an ownership interest in the entity that acquired Phase 1.  Therefore, Ciochetti,

Auer and Stiles devised a plan to work around that problem which was acceptable to SCBT.  Auer

and Stiles formed Heaven's Landing Development, LLC ("HLD") to become the owner of Phase

1.  The Debtor would do a short sale of Phase 1 to HLD for $2,600,000, SCBT would release its

lien, and JT Funding would finance the transaction (the "HLD Note" and together with the Real

Estate Deed to Secure Debt and any other related documents, the "HLD Loan Documents"), which

was secured by all three phases of the project.  JT Funding also made another loan of $1,300,000

to Debtor (the "Debtor Note" and together with the HLD Note, the "Notes) at that time to continue

the development of the Property, which loan was also secured by all three phases of the project.

Debtor could still own Phases 2 and 3 under this transaction because SCBT did not have those two

phases as collateral.  The short sale and the loans closed in 2013.  The HLD and Debtor Notes had

a term of seven years, maturing in 2020.  In addition to receiving interest under the Notes, JT

Funding received 22% of the net cash flow from each borrower as defined in the Notes (the "Profit

Participation").

　　　　Neither Ciochetti nor the Debtor had any ownership interest in HLD or JT Funding.  At the

hearing, both parties testified that this was really intended to be a loan transaction, but it was set

up this way to satisfy the FDIC regulations.  Even though HLD became the sole title owner of

Phase 1, and Ciochetti had no membership interest in HLD, Ciochetti was required to guarantee

the HLD Note to JT Funding and Debtor was required to pledge all of its property, Phases 2 and

4

3, to collateralize the HLD Note under a single security deed covering all three phases.  And even though neither HLD, Auer, nor Stiles had an ownership interest in Debtor, HLD was required to pledge its property, Phase 1, as collateral for the Debtor Note to JT Funding.  So basically, this was really a $4,000,000 transaction collateralized by the entire Property, Phases 1, 2 and 3, where a default would result in the foreclosure of the entire Property because the entire Property, regardless of who held legal title, was pledged as collateral under one single security deed.

Auer testified that no valuation was performed before HLD and JT Funding agreed to enter into the transaction with the Debtor.  Phase 2 is particularly valuable because it is only on that phase of the subdivision that airplane hangars can be built and the evidence before the Court was that the sale of the airplane hangars alone could produce millions of dollars of profit, plus lots could also be sold on that property, as well, and the availability of airplane hangars would help the sale of other lots throughout the subdivision.

Perhaps even more unusual than Ciochetti having to guaranty HLD's debt to JT Funding and Debtor having to pledge all of its assets to secure HLD's debt to JT Funding even though neither had a membership interest in HLD, HLD retained Debtor to manage its property under a written Management Agreement (the "Management Agreement") that provided for Debtor to receive 77% of the net cash flow of the HLD property compared to the mere 22% and 1% JT Funding and HLD were to receive respectively.  On top of Debtor receiving a whopping 77% of the net cash flow of HLD, Ciochetti had signature authority on HLD's bank accounts and was also provided with a car, a phone, and a boat, as well as his company, Heaven's Landing Realty, receiving a 5% commission on the sale of HLD lots.  This Management Agreement also provided for Debtor to continue to receive these economic benefits from the property owned by HLD even after JT Funding had been repaid on its loan.

5

So basically, Debtor and Ciochetti retained numerous indicia of ownership of Phase 1 after the transaction.  About the only indicia of ownership that they did not have was that they did not have legal title to the land or actual membership interests in HLD.  But Ciochetti and the Debtor continued to control the management of the HLD property and retained a substantial majority of the economic benefits from the operation of the HLD property.

The Debtor did not pay off the Notes to JT Funding within the seven-year term that matured in the summer of 2020 and there was friction between Ciochetti and Auer and Stiles about the management of the project.  Therefore, JT Funding sent a demand letter to HLD and the Debtor notifying them, among other things, that the Property, all three phases that served as collateral for the loans, would be foreclosed if the debt owed to it by both of them was not paid in full.  The Management Agreement was subsequently terminated.  The foreclosure sale was scheduled. Debtor consequently filed for Chapter 11 protection.

JT Funding filed two proofs of claim for payment in the case.  One claim was for the amount due under the Debtor Note and the other was for the amount due under the HLD Note.[2] Debtor filed a plan of reorganization which proposed to cram down JT Funding, the parties requested mediation which was unsuccessful, and the Debtor's first plan of reorganization came on for a confirmation hearing in October 2022.  That hearing spread out over three days of evidence and closing argument on the fourth day.  The Court denied confirmation of that plan but did not dismiss the case because the Court found that there was sufficient value in the Property – particularly Phase 2 owned by the Debtor – such that confirming a plan was possible, so it gave the Debtor 60 days to propose a plan that would pay all creditors in full on the Effective Date of

---

[2]     Although the Debtor's obligation under the HLD Note is arguably non-recourse under state law, 11 U.S.C. § 1111(b)(1)(A) provides that a claim secured by a lien on property of the estate, which the HLD Note is, is treated in bankruptcy the same as if the holder of the claim had recourse against the Debtor.

the plan, but the Court also modified the automatic stay to allow JT Funding to commence advertising the property in February 2023 for a foreclosure sale on March 7, 2023. Debtor filed a Second Amended Plan on December 19, 2022, which the Court set for hearing on January 26, 2023 (the "Confirmation Hearing"). The Debtor filed a Third Amended Plan and finally a Fourth Amended Plan on January 25, 2023, the day before the Confirmation Hearing. The Debtor also agreed to make several modifications at the Confirmation Hearing. The Debtor has now proposed a plan that proposes to pay all creditors in full in cash on or before the Effective Date of the Plan, which is March 3, 2023, a few days prior to the scheduled foreclosure sale, which it contends leaves all creditors unimpaired and no votes are necessary to confirm it (with the modifications announced or agreed to at the Confirmation Hearing, the "Plan").

The Plan as proposed now provides for Debtor to obtain a new loan or loans in the amount up to $5,000,000 to pay off the Debtor Note and the HLD Note. The amount owed under Debtor Note is $761,789.56 as of the Confirmation Hearing with interest accruing at $105.63 per day. The amount owed under the HLD Note is $3,797,602.87 as of the Confirmation Hearing with interest accruing at $649.90 per day. These amounts do not include any speculative amounts that may be due in the future under the Profit Participation.

With respect to the Debtor Note, the Plan provides for JT Funding's lien on the Property for principal, interest, fees, and charges to be satisfied upon payment in full, and for a new lender to have a security interest in the Phases 2 and 3 owned by the Debtor, but JT Funding will retain its lien for any future Profit Participation to the same extent and priority it has now.

With respect to the HLD Note, the Plan provides that upon payment of the full amount of the claim for principal, interest, fees, and charges a new lender will be subrogated to JT Funding's rights under the HLD Loan Documents, including the lien on the Property covering Phase 1 owned

by HLD, but JT Funding will retain its lien for any future Profit Participation.  Debtor agreed at the Confirmation Hearing that the Plan should be amended with respect to this claim as follows: (a) that JT Funding's lien for the Profit Participation must be *pari passu* with the new lender, (b) the rights to which the new lender would be subrogated would be those that exist on the date of payment, and (c) the payment of any future Profit Participation would be paid by the owner of Phase 1 if and when any amounts come due.  The Debtor also proposed in its Response to JT Funding's Objection to Confirmation and at the Confirmation Hearing that the Debtor could be subrogated to JT Funding's position in the alternative of the new lender on the same terms and conditions based on the Georgia subrogation statute.

Ciochetti testified that the new loan or loans provided for under the Plan to pay off the creditors in full would be provided by a company named Auspay or three friends of Ciochetti's who are affiliated with Auspay (collectively with any entity that they may form to make the loan, the "New Lender").  Attached to the Third Amended Plan was a letter from this lender who expressed a non-binding interest to make the loan to Debtor.  It was the Court's understanding from this that neither Ciochetti nor Debtor have an ownership interest in the New Lender.  The Debtor or Ciochetti has paid this lender a $25,000 fee already as required by this lender.

Ciochetti testified that future investment for the development of the Property would come from one or more of the following sources: additional loans, these investors, or Ciochetti, who testified that he had personal liquidity of $1,500,000 to invest in the project as necessary. Funding for the construction of airplane hangars should not be difficult to obtain because they will be very profitable.

JT Funding was the only party in interest that filed a written objection to the Plan.[3] The objections that the Court will consider first are the objection that subrogation is not appropriate with respect to JT Funding's claim under the HLD Note and that the Court does not have authority to order it in connection with a plan of reorganization.

## CONCLUSIONS OF LAW

As a threshold issue, JT Funding argues that the subrogation provisions in the Plan are not permitted by 11 U.S.C. § 1123(a)(5) because that section does not list subrogation as an option in the list of things that "provide adequate means for the plan's implementation." Section 1123(a)(5) provides: "(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—(5) provide adequate means for the plan's implementation, such as—" and then goes on to list different possibilities for implementing a plan. As the Debtor points out, this list in Section 1123(a)(5) is not exhaustive as evidenced by the use of the phrase "such as."

Bankruptcy courts have also considered subrogation rights through plans before. In *In re Rhead*, SKW held a claim that arose out of a guarantee executed by the Rheads. The court stated:

> "Having not yet made any payments, the Rheads have no present claim for reimbursement in either the Five Flags or Page estates, 11 U.S.C. § 502(e); they are entitled, nevertheless, to be subrogated to SKW's rights in accordance with Section 509(a). That section provides that the Rheads will be subrogated to the rights of SKW against Page and Five Flags to the extent that Rheads pay SKW under their Plan. Thus, the Rheads will be entitled, after SKW has been paid in full (including payments from the Rheads), to receive from Page and Five Flags the payments that otherwise would have gone to SKW. SKW will therefore be paid only once and Rheads will be reimbursed for any payments made by them.

---

[3]      One limited partner filed an objection to the first plan but did not appear at that hearing or the Confirmation Hearing. Other people sent letters by email to the Court's Chambers email address prior to the Confirmation Hearing and were told that pursuant to the Court's local rules they needed to file the papers with the Clerk, but none of them chose to do so nor did any of them make an appearance on the record at the Confirmation Hearing.

*In re Rhead*, 179 B.R. 169, 175 (Bankr. D. Ariz. 1995).

As in *Rhead*, Debtor, upon making full payment of JT Funding's claim against HLD to protect its interests, will be subrogated to the rights of JT Funding against HLD, subject to the Profit Participation.

This result makes sense. Section 1123(a)(5)(E) permits a plan to provide for "satisfaction or modification of any lien", Section 1123(a)(5)(F) permits a plan to provide for "cancellation or modification of any indenture or similar instrument." Section 1123(a)(5)(C) states that a plan may contain a "merger or consolidation of the debtor with one or more persons," and bankruptcy courts under this provision can merge, or substantively consolidate separate entities or cases. *See In re Cello Energy, LLC*, No. 10-04877-MAM-11, 2012 WL 1192784, at *11 (Bankr. S.D. Ala. 2012) (overruling objection to substantive consolidation in debtor's plan that proposed to consolidate three debtors into one entity); *In re Celebrity Resorts, LLC*, No. 6:10-BK-03550-ABB, 2010 WL 5392657, at *7 (Bankr. M.D. Fla. 2010) (substantively consolidating debtors' bankruptcy cases under the plan). If bankruptcy courts can substantively consolidate entities, modify instruments, and cancel and satisfy liens, surely this Court can order subrogation upon full payment of an obligation.[4] Subrogation under the facts of this case is less intrusive than other means to implement plans that are expressly listed in Section 1123. JT Funding's argument that Section 1123 does not allow for subrogation provisions is unavailing.

The Plan as filed proposes that a new lender – as opposed to the Debtor – be subrogated to JT Funding's rights under the HLD Loan Documents based on the Georgia case law on equitable subrogation so the Court will address that next.

_____

[4] This should be true even more so with respect to those claims for which proofs of claim were filed, which was the case here.

10

The only situation in which the Georgia courts have applied equitable subrogation is where a new lender intends to get or is supposed to get a first priority lien on property, but something happens to prevent that, usually an intervening lien before the new lender can perfect its lien. The following elements must be met for a lender to be equitably subrogated to the lien it paid off:

> Where one advances money to pay off an encumbrance on realty either at the instance of the owner of the property or the holder of the encumbrance, either upon the express understanding or under circumstances under which an understanding will be implied that the advance made is to be secured by the senior lien on the property, in the event the new security is for any reason not a first lien on the property, the holder of the security, if not chargeable with culpable or inexcusable neglect, will be subrogated to the rights of the prior encumbrancer under the security held by him, unless the superior or equal equity of others would be prejudiced thereby.

*Kim v. First Intercontinental Bank*, 326 Ga.App. 424, 426, 756 S.E.2d 655, 658 (2014); *see also In re Hedrick*, 524 F.3d 1175 (11th Cir.), amended on reh'g in part, 529 F.3d 1026 (11th Cir. 2008) (applying Georgia's law of equitable subrogation as outlined above to a bankruptcy case).

The Court has reviewed these elements in connection with the facts of this case and reviewed many cases tracing the development of this doctrine. Based on that, the Court has determined that the New Lender does not satisfy the element that there was an express or implied understanding that the advance is to be secured by a senior lien on the property. Although there is an express understanding between the New Lender and the Debtor in this case, that is not the focus of this inquiry. The New Lender must show that its understanding is with either the old lender, in this case JT Funding, or the borrower of JT Funding, in this case HLD. Because neither of those had an express or implied understanding with the New Lender that it should have a senior lien, the New Lender cannot be equitably subrogated under Georgia law.

The Court will now address Debtor's position that it can be subrogated to JT Funding in connection with the HLD Loan Documents based on Georgia statutory subrogation.

The following Georgia Code Sections are the primary focus of this inquiry:

O.C.G.A. § 10-7-1: The contract of suretyship or guaranty is one whereby a person obligates himself to pay the debt of another in consideration of a benefit flowing to the surety or in consideration of credit or indulgence or other benefit given to his principal, the principal in either instance remaining bound therefor. Sureties, including those formerly called guarantors, are jointly and severally liable with their principal unless the contract provides otherwise. There shall be no distinction between contracts of suretyship and guaranty.

O.C.G.A. § 10-7-56: A surety who has paid the debt of his principal shall be subrogated, in law and in equity, to all the rights of the creditor and, in a controversy with other creditors, shall rank in dignity the same as the creditor whose claim he paid.

O.C.G.A. § 10-7-57: A surety who has paid the debt of his principal shall also be entitled to be substituted in place of the creditor as to all securities held by him for the payment of the debt.

Debtor argues that by pledging all of its property, Phases 2 and 3, as collateral for the HLD Note, it is a surety or guarantor under these sections, and upon payment of the full amount currently due under the HLD Note it is entitled to be subrogated to the HLD Loan Documents held by JT Funding except to the extent of the future Profit Participation which shall remain with JT Funding.

JT Funding argues that Debtor is not a surety or guarantor under these statutes because it only pledged its collateral and is not personally liable for the HLD Note. In support of this position, it cites *Yates v. Trust Co. Bank of Middle Georgia*, 212 Ga.App. 438, 442 S.E.2d 293 (1994) and *Johnson v. AgSouth Farm Credit*, 267 Ga.App. 567, 600 S.E.2d 664 (2004). JT Funding asserts that *Yates* stands for the proposition that a co-owner of property pledged as collateral is not a surety and that *Johnson* stands for the proposition that a co-maker that pledged separate collateral is not a surety.

In *Yates*, a mother and son were co-owners of a certificate of deposit (the "CD"). The son took out a car loan from the bank at which the CD was issued. The CD agreement contained

12

standard setoff language regarding any liability of any co-owner who is in default on any obligation to the Bank.  The mother was not obligated on the debt, nor did she or her son sign any documents pledging the CD as collateral for the loan.  The son defaulted on the loan, so the Bank setoff against the CD as permitted by the CD agreement.

The mother did not sue to be subrogated to the Bank but rather sued the Bank for conversion of her funds on account of the set off.   It appears she purchased the CD and made her son co-owner, but she inadvertently never actually signed any documents.  She did, however, continue to accept the interest payments that were made on it multiple times after each renewal, effectively estopping her from arguing that she was not bound by the agreement because of the statute of frauds.  The Court of Appeals found that the case was controlled by *Simpson v. GA State Bank*, 159 Ga.App 310, 283 S.E.2d 278 (1981).

The Georgia Court of Appeals then went on to reject the mother's argument that the set off provision is a guaranty or created an obligation for her to answer for the debt of her son.  The Court did say there is no language in the CD agreement she did not sign that made her personally liable for her son's debt, but the Court also noted that she could have withdrawn the funds from the Bank without the debt being paid or her being personally liable for the debt.  And those are major factual differences between that case and this case:  Debtor in this case did formally sign an agreement to pledge all of its property as collateral and it does not have the right to sell its property without paying JT Funding, which means the Debtor agreed to an obligation to JT Funding which it could not avoid other than by paying it.

In *Johnson v AgSouth*, Johnson and Moody were co-borrowers on a loan to buy a piece of property they jointly owned and secured the loan with that property and two properties owned by Moody and one by Johnson.  Johnson's property had a pre-existing lien on it to the Bank which

was paid off with the loan proceeds.  As between them and the Bank, they were jointly and severally liable for the full amount of the loan, but as between themselves they had an agreement that they would be equally responsible for the purchase price of the new tract and Johnson would be responsible for the portion of loan that went to pay off his prior debt.  The loan went into default, and Moody paid off the loan and took an assignment of the Bank's position.

Johnson claimed that the Bank improperly refused to release the lien on his property when the loan was repaid.  The Bank argued that that even though Moody signed the note as a co-maker he was really signing as a surety.  The Court of Appeals found that there was no evidence, including in their written agreement, that Johnson was the principal debtor and Moody was a surety.  The Court cited *Sherling v. Long* for the proposition that "a joint obligor is not subrogated in law to the rights of the creditor as against his co-obligor for contribution."  *Sherling v. Long*, 122 Ga. 797, 50 S.E. 935 (1905).  Because Debtor in the case before this Court is not a co-borrower on the HLD Note, it is not a co-maker like in *Johnson*, so that case is distinguishable from the facts of this case and not applicable.

Contrast those two cases to *Fleming v. First American Bank*, 171 Ga.App. 295, 319 S.E.2d 119 (1984).  In *Fleming*, a husband and wife gave a deed to their house to the Bank to secure a loan to a corporation in which the husband had an interest.  The loan was then assumed by a successor corporation which borrowed additional money.  The wife signed a hypothecation agreement with the Bank authorizing the second corporation to use the deed as collateral for the loan.  The security deed executed by the wife contained a dragnet clause covering any future indebtedness of the grantor, the wife, to the Bank.  The wife never signed a note, only a

14

hypothecation or pledge agreement.[5]  Both loans went into default, and the house was foreclosed. The wife sued the Bank claiming the foreclosure was wrongful because the dragnet clause was not effective against her because the Georgia statute at issue says that dragnet clauses are only effective to secure a debt or obligation that may be owing by the grantor if the debt arises out of a contract between the original parties to the security agreement, and there was a lack of identity between the first corporation and the second corporation.

The *Fleming* Court found that although there was no personal guaranty by the wife, there was a hypothecation agreement which granted the second corporation the power to use her property as collateral for loans.  The Court found that the hypothecation agreement was analogous to a guaranty even though she had no personal liability because she obligated herself to permit the use of her property as collateral.  Therefore, the Court held that even though she had not signed the note to the Bank, the hypothecation agreement created an obligation from her to the Bank that allowed the Bank to exercise its rights under the dragnet clause and foreclose her property.

Relying in part on *Fleming*, Judge Drake ruled similarly in *In re Synergy Inv. Grp., LLC*, No. 12-11609-WHD, 2014 WL 2006571 (Bankr. N.D. Ga. 2014).  The issue in that case involved the statute of frauds, but Judge Drake found that hypothecation agreements are analogous to surety and guaranty agreements, such that the statute of frauds applies to them.  Judge Drake said:

> Although the suretyship provision typically governs traditional guarantees, *see id.* § 11 (using personal guarantees as examples), the Court believes its precepts extend to hypothecation agreements. Cf. *Schiska v. Schramm*, 1 Or. 647, 652–53 (Or.1935) (en banc) ("It is true that defendant Cox was not personally bound; but that is not essential to create the relationship of surety.... Some law writers treat the property pledged by its owner to answer for the debt or default of another as occupying the position of a surety.") (citations omitted); *MDL Med. Diagnosis Lab. v. Schram*,

---

[5]    "The Georgia Supreme Court has recognized that 'hypothecate' means to pledge property in order to borrow money or as security for a loan." *Club Assoc. v. Consolidated Capital Realty Investors (In re Club Associates)*, 951 F.2d 1223, 1231 (11th Cir.1992).

2011 WL 2803479, at *4 (Cal.App.2011) ("A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor.") (quoting CAL. CIV. CODE § 2787) (internal quotations omitted) (partially overturned on alternative grounds); . . . *Pearl v. General Motors Acceptance Corp.*, 13 Cal.App.4th 1023, 1028 (Cal.App.1993) ("Since under the pledge agreement Pearl 'hypothecated,' or pledged, his stock as security for the debts of Palomar, ... Pearl is a 'guarantor' and the pledge agreement is implicitly a 'guaranty' for purposes of the suretyship provisions of the Civil Code...."). . . Supportingly, the *Fleming* Court found guarantees and hypothecations interchangeably analogous and held that the hypothecation "created an obligation" in the promisor to have her property answer for the default of another. *Fleming v. First Am. Bank & Trust Co.*, 171 Ga.App. 295, 295 (Ga.App.1984). Accordingly, the statute of frauds should apply. Moreover, because of the emphasis placed on their similar purpose and function, the Court finds it appropriate that hypothecations meet the general standards required for guarantees in Georgia.

*In re Synergy Inv. Grp., LLC*, No. 12-11609-WHD, 2014 WL 2006571, at *4 (Bankr. N.D. Ga. 2014).

The Code Section Judge Drake considered was O.C.G.A. § 13-5-30(2), which requires that a "promise to answer for the debt of another" be in writing and signed. O.C.G.A. § 10-7-1 provides that a contract of surety or guaranty is one where "a person obligates himself to pay the debt of another." People can try to split hairs on the minor difference in language, like using the word answer instead of obligate, but they mean the same thing. They serve the same purpose and function, as Judge Drake said.

The rulings by the Georgia Court of Appeals in *Fleming* and by Judge Drake in *Synergy* are by no means outliers or controversial but are just basic hornbook law. For example, 74 Am. Jur. 2d Suretyship § 8 states:

Although the relationship of principal and surety generally springs from some agreement by which one person becomes personally bound for the debt of another, it may likewise grow out of a transaction whereby a person's property becomes security for payment of a debt or the performance of an act by another. Thus, a

suretyship relation may be affected by a pledge of property to secure another's obligation.

74 Am. Jur. 2d Suretyship § 8.

The Court has also considered whether the Debtor's pledging of all of its property as collateral could be likened to a surety who posts a bond, and whether such a surety could qualify as a surety under the Georgia subrogation statutes. The reason the Court considered this inquiry is because a surety who posts a bond is not personally liable in the way JT Funding is asking the Court to interpret the statute, but rather the liability is limited to the amount of the bond. Although the bond is usually a reasonable estimate of the potential liability and should cover the liability, the surety will cap its exposure to the amount of the bond because that is necessary for it to underwrite its risks in issuing the bond.

State and Federal courts have considered this issue and have ruled that a surety who posts a bond is a surety under the Georgia subrogation statues found in Chapter 10 of the Georgia Code.

In *Cotton States Mutual Insurance Co v Citizens & Southern National Bank*, the Georgia Court of Appeals stated:

> There can be **no question** that Cotton States, as surety for Georgia-Carolina, has subrogation rights with respect to any funds earned and paid to the contractor and still in the contractor's hands. OCGA 10-7-56 and 57 (other citations omitted)…[T]he relevant Code sections are intended to preserve and protect the surety's right of subrogation.

*Cotton States Mut. Ins. Co. v. Citizens & S. Nat. Bank*, 168 Ga.App. 83, 308 S.E.2d 199 (1983) (emphasis added).

The Eleventh Circuit Court of Appeals has said the same thing, and its decisions are binding on this Court. In *American Manufacturing Mutual Insurance Company v. Tison Hog Marketing, Inc.*, the Eleventh Circuit Court of Appeals said:

17

> Instead of applying insurance law, however the district court should have applied Georgia surety law. The surety bonds in this case are surety contracts that are not governed exclusively by insurance law of Georgia…
>
> The Georgia Code contains an entirely separate title that applies to suretyship contracts. See OCGA 10-7-1, et seq. The Chapter defines a contract of suretyship as one "whereby a person obligates himself to pay the debt of another in consideration for a benefit flowing to the surety." …This is the commonly understood definition of a surety relationship and describes the situation that we have in the case at bar.

*Am. Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.*, 182 F.3d 1284 (11th Cir. 1999).

Judge Orinda Evans from the District Court of the Northern District of Georgia followed that reasoning in *Berkman Plaza 2, LLC v. Fid. & Deposit Co. of Maryland*, No. 1:09-CV-1116-ODE, 2009 WL 10671363 (N.D. Ga. 2009), order clarified on reconsideration, No. 1:09-CV-1116-ODE, 2009 WL 10671364 (N.D. Ga. 2009). In that case, Judge Evans likewise found that surety bonds are surety contracts under OCGA 10-7-1, et seq.

Based on that, it would seem that if a surety who posts a bond can qualify as a surety under the Georgia subrogation statutes, then a party who pledges all of its property as collateral to secure the debt of another should be able to qualify as a surety under those statues. The Court finds this particularly applicable under the facts of this case. Debtor bought this Property for about $5,100,000 in the early 2000's and substantially improved it with a runway, taxi way, clubhouse, and roads, among other things. A bank was willing to loan about $6,000,000 to Debtor just on Phase 1 alone. The value of the Property went up in the mid 2000's and certainly came down during the Great Recession, but real estate prices have gone up dramatically in North Georgia since then. JT Funding was willing to loan $4,000,000 secured by this entire project without even doing any real due diligence which shows that it was comfortable enough with the value of the Property to make the loan. And all of that goes to the point that there is substantial value in this Property over and above the $4,600,000 that is now owed to JT Funding. So, when JT Funding received a

lien on all of Debtor's property in 2013 to collateralize the debt owed by HLD, including the valuable Phase 2 on which the airplane hangars could be built, it was confident it would be paid in full.  And frankly, a so called "personal, written guaranty" from Debtor would not have been worth as much as getting a pledge of all of its assets because the only ability Debtor would have to pay the HLD Note would be from the value of that property, either from a sale or refinance.  If the Debtor's property is foreclosed, a so-called personal written guaranty would not be of any value because Debtor would not have anything left for JT Funding to pursue anyway.

But the value of the property Debtor pledged as collateral to JT Funding to support the HLD Note is evident, particularly Phase 2 on which the airplane hangars will be built and sold. Why else would JT Funding be objecting to getting paid in full in cash in a few weeks?  It is obvious that the reason it is objecting is because it wants the value of Debtor's property, particularly Phase 2, for itself to the detriment of the Debtor.

The Court surmises the reason for the lack of cases specifically on our facts under the Georgia subrogation statute is because the legal principals are straightforward hornbook law. Judge Drake even noted that the roots go all the way back to "old English common law."  *In re Synergy Inv. Grp., LLC*, No. 12-11609-WHD, 2014 WL 2006571, at *5 (Bankr. N.D. Ga. 2014). The Debtor has obligated itself to pay the HLD Note by pledging all of its property as collateral – and not just any property, but Phase 2 in which there is substantial equity because of the value in the airplane hangars.  Property does not just pledge itself as collateral, but a person has to affirmatively pledge, or obligate his or her property to the payment of a debt.  In addition, Debtor here is not arguing it is a surety as some cute defense to get off liability, but rather it is, in fact, proposing to pay the HLD Note in full through a refinance of its property to protect its property and wants the benefit of the Georgia subrogation statutes in that regard.

The implication of what JT Funding seems to argue is that O.C.G.A. § 10-7-1 necessarily requires that a suretyship or guaranty contain an obligation that can be sued upon such that a personal money judgment can be rendered against it by the creditor.[6]  But the language in the statute is not that narrow, rather the statute talks about someone who just generally obligates himself to pay the debt of another.  And the Georgia courts and basic hornbook law have been clear that pledging property to collateralize someone else's debt is an undertaking to answer for the debt of another.  What this Court thinks that sentence in the statute is intending to tell us is that a volunteer who makes a payment cannot qualify as a surety for the purpose of the subrogation statute.  In other words, if A makes a loan to B and it is guaranteed by C, D cannot payoff A and be subrogated to A as a matter of law.

The Court has also considered what the public policy reason would be to not permit a person who pledges all of its property as collateral to support a loan to be able to benefit from these Georgia subrogation statutes after that person pays off the loan to protect its interest, and the Court could not think of any good public policy reasons for such a result.  If a typical guarantor who pays a claim in full can be subrogated, why should a person who pledges all of its property as collateral to support a loan and who pays the loan in full to protect its interests to prevent foreclosure of its property not be subrogated?  That just does not make any sense.

JT Funding has raised other objections to the subrogation of the claim that the Court will now address.

---

[6]      The Court also notes that the argument that JT Funding makes that the Debtor is not personally liable on the HLD Note was altered when JT Funding filed a proof of claim for payment of the claim by the Debtor in the bankruptcy case and by the operation of 11 U.S.C. § 1111 of the Bankruptcy Code, which converts non-recourse debts into recourse debts except to the extent the property is sold for less than the amount of the debt.  The Court also wants to point out that the effect of Section 1111 is not integral to its decision but does add additional support.

Another objection that JT Funding has raised is that its claim under the HLD Note is not subject to subrogation as proposed by the Plan because its claim is not being paid in full. By this it means that after payment of its full principal, interest, attorneys fees, costs, charges, and accrued but unpaid Profit Participation, it will still have a claim for the future, speculative, contingent Profit Participation, that is the amounts that it may possibly be owed in the future if HLD has sufficient Net Cash Flow as defined in the HLD Note to be required to make a payment toward the Profit Participation.

JT Funding holds two types of claims under its agreements with HLD and the Debtor pursuant to the Notes. The first type of claim is the more traditional claim a lender would have for principal, interest, fees, and costs. The second type of claim, the Profit Participation, is in the nature of a preferred equity interest, the payment of which is also secured by the property. Under the Notes, the Profit Participation was due quarterly to the extent any was owed until payment in full of all principal, interest, fees, and charges due under the Notes. But upon payment in full of the principal, interest, fees and costs, the Profit Participation – if any is due thereafter - must be paid upon the sale of any lot or JT Funding would not have to release its lien on that lot. At this point, it is no longer a typical loan obligation that accrues interest, fees, and costs, but really just an equity kicker that is immediately payable to the extent the formula set out in the Notes provides for a payment. The debt, the actual outstanding liability on the claim, will be paid in full in cash on or before the Effective Date. The Profit Participation, an equity kicker, will only be paid when lots are sold if the Net Cash Flow exists at the time of the sale and those amounts will not accrue any interest, fees, or charges. And under the Plan, JT Funding can still compel the payment of any future Profit Participation because it is unlikely that a title company would close a sale of a lot

without JT Funding releasing its lien, so payment will be made immediately upon the claim actually arising.

So, once the principal, interest, fees, and costs due under the traditional loan component of the HLD Note have been paid in full by the Debtor to protect the interest in its property it pledged as collateral, the Debtor can be subrogated to JT Funding's rights under the HLD Loan Documents to enforce payment of the loan portion of the agreement and leave undisturbed JT Funding's potential future Profit Participation because they are really two different claims.

Furthermore, future payment of any Profit Participation under the HLD Note is very unlikely. First, the loan has matured so it is subject to foreclosure. JT Funding acknowledges that the Profit Participation would not survive a foreclosure, nor is it even remotely possible that a foreclosure on Phase 1 would bring enough of a sale price that it would create Net Sales Proceeds as defined in the Note because more than $3,700,000 is owed and the Court found the value of Phase 1 to only be $2,650,000, which even exceeded the $1,700,000 value JT Funding's appraiser put on Phase 1.

Second, even if Phase 1 was not foreclosed within the next few months, it is unlikely that any lot sales would generate sufficient Net Cash Flow to pay the Profit Participation because there is about $500,000 of interest that must be paid on the HLD Note before there would be Net Cash Flow and that interest increases at a rate of about $20,000 a month. Therefore, as to the HLD Note, there really is no realistic claim to any future Profit Participation.

JT Funding objects and argues that, given the history between the parties, the equities of the case do not favor subrogation. However, the Court finds that the equities of the case do favor subrogation. Because JT Funding would be paid in cash in full within a few weeks, and the subrogation only takes place upon that payment, it would actually be inequitable to the Debtor if

JT Funding's claim was paid in full and Debtor was not allowed to step into the shoes of JT Funding.  Allowing JT Funding to receive full satisfaction of its claim, and HLD to retain the property unencumbered would not be an equitable resolution.

In addition, subrogation on the facts of this case also favor the Debtor being subrogated as to Phase 1 because it basically will ultimately restore the economic terms the parties negotiated in 2013 – the 77/22 split of profits – under which the parties operated for seven years until shortly before the bankruptcy.

JT Funding objects to any attempts to provide the Debtor or its New Lender with subrogation and protections for amounts lent to Debtor in excess of amounts due to JT Funding. Any subrogation rights would not include protections for other amounts extended beyond those paid to satisfy HLD's obligation to JT Funding.  To the extent Debtor is attempting to do that, the objection would have merit, but the Court is unaware of any attempt to have excess funds not used to pay off the loan subrogated to JT Funding's priority as to HLD's property.  So, to the extent it is not clear, Debtor's subrogation rights only extend to the money used to pay off the HLD Note. No subrogation rights extend to any of the other money loaned by New Lender to Debtor.

So, if the Debtor can obtain a loan to protect its property and payoff the HLD Note, it qualifies as a surety or guarantor under the Georgia subrogation statutes at issue here.  Provided, however it must be able to satisfy the other requirements Sections 1129 and 1191 of the Bankruptcy Code in order to confirm the Plan.

JT Funding objected to the Plan on the grounds that it is likely to be proceeded by a future reorganization or liquidation.  Ciochetti testified that the financing to pay off the creditors in this case in full in cash on the Effective Date is in place, and there was no evidence to the contrary presented.  If the financing does not come through by March 3, 2023, then JT Funding is able to

foreclose the Property on March 7, 2023, in which event there would be no further need for liquidation or reorganization of the Debtor. JT Funding's objection was not based on the feasibility of the Debtor obtaining its financing to consummate the Plan, but instead was based on what the Debtor will do after that. Mr. Ciochetti testified that the Debtor would obtain an additional loan or investment to construct hangars and that he has $1,500,000 of liquidity to assist with development. The value of the hangars is such that it should be easy to obtain financing for their construction and they should prove to be profitable for the Debtor in multiple ways. Therefore, the Court finds that Debtor has satisfied its burden on this requirement for confirmation.

Bankruptcy Code sections 11 U.S.C. §§ 1129(a)(8) and (a)(10) are also met because there are no impaired classes of creditors. Impairment is any alteration of the legal, equitable, or contractual rights of a creditor. *See* 11 U.S.C. § 1124; *In re Club Assocs.*, 107 B.R. 385, 401 (Bankr. N.D. Ga. 1989), subsequently aff'd, 956 F.2d 1065 (11th Cir. 1992). JT Funding argues it is impaired under the Plan because it is not receiving full payment of its claims. Notably, the Plan provides for full payment of everything due on JT Funding's claim; the principal, interest, costs, charges, and any accrued and due Profit Participation on its claims are all being paid on the Effective Date and the Plan provides that JT Funding's Profit Participation will continue to be paid if and when it comes due. This is what JT Funding's loan documents currently provide for so there is no alteration. In fact, with one minor modification to the Plan discussed below, which Debtor agreed to at the Confirmation Hearing, JT Funding's contractual rights remain intact. This modification provides that JT Funding's Profit Participation remains secured by all of its collateral *pari passu* with the Debtor who will be subrogated to JT Funding's other rights to the collateral under the HLD Loan Documents. Keeping the Profit Participation *pari passu* with the Debtor's rights after being subrogated leaves JT Funding's contractual rights unaltered because JT

24

Funding's Profit Participation will be secured to the same extent and priority that it has been secured to up to this point.

JT Funding also argued that its Profit Participation is impaired with respect to the Debtor Note because it does not know the terms of the loan from the New Lender that will be secured by Phases 2 and 3. The formula for the Profit Participation set out in the Debtor Note is not affected by the terms of a new loan because the Profit Participation will continue to be secured by a senior lien on those properties, so that formula must be honored by the parties. The Debtor Note even contemplates the continued payment of the Profit Participation after the principal, interest, fees, and costs are paid in full, but the Debtor Note does not prevent a refinancing nor does the formula for calculating the Profit Participation in the Debtor Note put a limit on the interest, fees, and costs used in the calculation. Therefore, the claim for Profit Participation is not impaired by the Plan.

The Plan lists the Class 5 creditors as being paid 90 days after the Effective Date, which would be an impairment, but as previously noted, Debtor agreed at the Confirmation Hearing that the Class 5 creditors will be paid in full in cash on the Effective Date of the Plan. All other arguments about impairment under the Plan were resolved by amendments in the Fourth Amended Plan. Subject to the minor changes already discussed, the Plan does not impair any creditors.[7]

JT Funding objected to the Plan to the extent that it provides any protection to Michael Ciochetti for his obligations to JT Funding to pay its claims. The Court takes note of Section 12.4

---

[7]    The United States Trustee filed an Objection to Debtor's eligibility to proceed under Subchapter V, which was joined by JT Funding, but The United States Trustee agreed that the objection was moot if the Debtor amended the Plan to unimpair the class of unsecured creditors by paying them in full on the Effective Date instead of 90 days after the Effective Date, an amendment the Debtor agreed to make at the Confirmation Hearing. Based on this modification, all classes under the Plan would be unimpaired and no voting would be necessary, so it would not make a difference whether the Debtor proceeded under Subchapter V or not. The United States Trustee's Motion will be the subject of a separate order.

of the Plan titled: Exculpation and Limitation of Liability, but the Court interprets this section as referring to post-petition conduct and claims and not referring to the release of any pre-petition conduct or claims.  To the extent that the intention of the Debtor is to release Michael Ciochetti from liability for conduct that occurred before the filing of this bankruptcy case, there shall be no release of liability for pre-petition conduct of Michael Ciochetti, except to the extent the claims are paid in full and that works as a satisfaction of the claims against him, but that will be an issue for a state court to determine.  Further, the Court notes that Michael Ciochetti executed guaranty agreements whereby Ciochetti agreed to personally guaranty payment of debts to JT Funding.  Because JT Funding's Profit Participation will survive and continue to be paid as due, Michael Ciochetti's guaranty remains in effect to the extent that the guaranty covers the Profit Participation.

JT Funding also objected that Debtor is seeking to mandate that JT Funding's rights as to its collateral be transferred through subrogation with a declaration of such rights by way of a confirmation order instead of paying JT Funding's claim and then pursuing claims for reimbursement or contribution.  JT Funding argues that Debtor can either elect to pay in full the debt held by JT Funding under Proof of Claim Number 3 reserving rights, if any, to seek contribution or reimbursement, or it can surrender its interest in its Real Property held as collateral for payment of the debt. Without getting into the issue of whether the Debtor is entitled to contribution from HLD, with whom it was not a co-maker, neither the Bankruptcy Code nor Georgia law not limit Debtor to the course of action as suggested by JT Funding.  Upon payment of the obligation to JT Funding, the Debtor is entitled to subrogation pursuant to the Georgia subrogation statute, Debtor has elected that remedy and the Court has the authority to confirm a plan doing so under the facts of this case.

JT Funding also objected to being forced to sign or execute any documents to implement the Plan. The Plan does not require JT Funding to do anything or take any action to implement the Plan, but JT Funding must comply with applicable state law and its obligations under its loan documents.

The remaining objections listed in JT Funding's Objections to the Plan and argued at the Confirmation Hearing have been satisfied either by the amendments in the Fourth Amended Plan of Reorganization or by the modifications announced at the Confirmation Hearing and addressed in this Order or the Court's Oral Ruling and are therefore overruled. All objections not otherwise dealt with specifically in this Order or the Oral Ruling are also overruled based on the consideration of the entire record in the case and the application of applicable law to those facts.

## <u>CONCLUSION</u>

Based on the foregoing, the Court finds that the Plan, as modified herein, satisfies all of the requirements of Bankruptcy Code Sections 11 U.S.C. §§ 1129 and 1191 and should be confirmed. Accordingly, it is hereby

**ORDERED** that the Fourth Amended Plan, as modified by this Order, should be confirmed; and it is further

**ORDERED** that Section 5.6 of the Plan is modified as follows: upon payment of the Class 4 Claim in full, the Debtor, as opposed to the Post-Petition Lender as defined in the Plan, will be subrogated to the rights of JT Funding under the HLD Loan Documents with respect to principal, interest, fees, unpaid Profit Participation, costs and charges; it is further

**ORDERED** that Section 5.6 of the Plan is modified as follows: the rights to which Debtor will be subrogated will be those that exist as of the date of payment of JT Funding's claim against HLD, not as of the petition date; it is further

**ORDERED** that Section 5.6 of the Plan is clarified as follows: JT Funding's Profit Participation on the HLD Note shall survive and continue to be paid by the owner of Phase 1 as it comes due and it shall remain secured *passu* with the Debtor's subrogation rights under the HLD Loan Documents; it is further

**ORDERED** that if requested by the New Lender, Debtor is authorized to assign its position and subrogation rights on the HLD Loan Documents to New Lender and Debtor is authorized to execute any and all documents necessary to effectuate such assignment; and it is further

**ORDERED** that Section 5.5 of the Plan is clarified as follows: JT Funding's Profit Participation on the Debtor Note shall survive and continue to be paid as it comes due and it shall remain secured by a first priority lien on any property it currently has as collateral to secure payment of the Profit Participation according to the terms of the applicable loan documents; it is further

**ORDERED** that Section 5.7 of the Plan is modified as follows: the Class 5 creditors shall be paid in cash in full on or before the Effective Date; and it is further

**ORDERED** that because neither Debtor nor Ciochetti have an ownership interest in New Lender and New Lender has acted in good faith, the credit extended and loans made to the Debtor by New Lender shall be and hereby are deemed to have been extended in good faith, as that term is used in 11 U.S.C. § 364(e) of the Bankruptcy Code, to the extent applicable; and it is further

**ORDERED** that Debtor shall file a report with the Court no later than March 7, 2023, whether the payments under the Plan have been made, and JT Funding shall file a report by March 9, 2023, if the Property is foreclosed including a report of the sales price and who the successful bidder was.

The Clerk of Court is directed to serve this Order on Counsel for the Debtor, Counsel for JT Funding, Inc., the United States Trustee, and the Subchapter V Trustee.

**END OF DOCUMENT**